## THE BOARD OF COMMISSIONERS OF MARSHALL COUNTY v. ALEXANDER McLEOD.

COUNTY ASYLUM; *Duty of Superintendent.* The superintendent of the county asylum, in the management thereof, and in the care and custody of paupers placed therein, is under the control, and subject to the order and direction, of the board of county commissioners; and where the commissioners find that persons who have been placed in such asylum are no longer entitled to support at the public expense, and make an order directing the superintendent to discharge them from the asylum, it is his duty to comply with such order.

*Error from Marshall District Court.*

AT the December Term, 1883, plaintiff *McLeod* had judgment against the defendant *Board of Commissioners* for $924.20 and costs, which judgment it brings here for review. The material facts appear in the opinion.

*E. A. Berry,* for plaintiff in error.

*W. A. Calderhead,* and *Charles H. Lemon,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J.: This action was brought by Alexander McLeod, defendant in error, to recover from the county of Marshall the sum of $2,389.91, for services performed by him as superintendent of the county asylum for the poor, and for the care and keeping of certain paupers that had been committed to his charge. It appears that in Marshall county there is a regularly established county asylum for the support and protection of the poor of that county, and that the board of county commissioners designated and employed the defendant in error as superintendent of the county asylum for a term of three years, commencing March 1, 1880. By the terms of the employment he was to receive from the county board the sum of $3.75 per week for taking care of and supporting ordinary paupers, while for those that were insane or idiotic, and who required extra attention, he was to receive $8 per week. Among the persons committed to the charge of the superintendent was Kate Patten and her infant child Tilly, who were placed in the asylum on January 1, 1882, by the trustee of Marysville township, and remained there until January 26, 1883. The bill for their maintenance from the time when they were admitted until July 1, 1882, was presented by the superintendent and allowed by the county board at the regular July session, 1882; but it seems that about the latter date, the members of the board of county commissioners visited the asylum and found Kate Patten to be a healthy and robust person, and that her child was then about eighteen or twenty months old, and they determined that she was no longer entitled to public support, and ought to be discharged from the poor-house, and so notified the superintendent, McLeod. The superintendent, however, did not discharge them from his custody until January 26, 1883, and at a sub-

sequent meeting of the county board he presented for allowance a bill of $225 for their support and maintenance from July 1, 1882, to January 26, 1883, which the board disallowed. To recover this and other charges claimed by the plaintiff below, this proceeding was brought; but as the county had tendered to the superintendent all that was claimed by him other than the item for the maintenance of Kate Patten and her child, that item was the only real controversy between the parties.

Upon the trial the board of county commissioners offered to prove:

"*First*, That at the time of their visit in July, 1882, to the county poor-farm, as aforesaid, they found the said Kate Patten and her child to be unfit persons to be supported by the county, and they looked for and found a situation for her and her child in the family of A. G. Barrett, where she could earn support for herself and child. *Second*, That on their return they made an order, which order was entered upon the journal of proceedings as follows, to wit:

"'STATE OF KANSAS, COUNTY OF MARSHALL, ss. — OFFICE OF COUNTY CLERK, THURSDAY, July 13, 1882. — The board of county commissioners met in regular session, pursuant to adjournment. Present: C. E. Tibbetts, I. C. Legere, L. W. Libby, J. A. Broughten, county atttorney. The following proceedings were had, to wit: Ordered by the board of county commissioners, that Miss Kate Patten and her child be discharged from the county poor-house forthwith, and that a quarterly allowance of $20 be made her for the third quarter of 1882.'

*Third*, That a written copy of said order was, on the 14th day of July, 1882, by the county clerk of said county, served upon the plaintiff; that the county board at that time, the same being the regular July meeting, made an allowance of $20 to aid said Kate Patten for the three months after she had left the poor-farm. *Fourth*, That the members of the board severally at the time of said visit told said plaintiff that the said Kate Patten and child should no longer remain at the poor-farm, and directed him, as superintendent of the asylum, to have them removed at the cost of the county to the home of the said A. G. Barrett, where a place had been provided for them. *Fifth*, That said plaintiff refused to remove said persons, or to allow them to be removed by said commissioners, giving as a reason for refusing so to do, that the board of county commissioners had no authority to remove or discharge an inmate of the county poor-house."

This testimony was excluded from the jury, upon the objection of the plaintiff below; and afterward, the court in effect instructed the jury that the superintendent was entitled to compensation for the support of Kate Patten and her child for the entire time they were in the poor-house, notwithstanding the order of the board that they must be discharged. These rulings were excepted to, and are assigned for errror here; and the question is presented: Can the superintendent of the asylum for the poor retain in the asylum, and collect payment from the county for the support of persons who have beeen ordered to be discharged by the board of county commissioners as not entitled to public support?

The mayor and council of incorporated cities and the township trustees of the various townships of the state are, by the statute, constituted overseers of the poor within their respective townships or cities; and the contention of the defendant in error is, that by virtue of this authority the overseers of the poor alone have jurisdiction or control over the person of the pauper. The power to discharge persons from the poor-house is not expressly conferred by the statute upon any officer or board, but it was certainly not contemplated that all who were placed in the asylum for the poor should permanently remain there. Persons who are not needy are not to be supported at the expense of the public. Many are placed in the poor-house who need only temporary relief, and the authority to determine when such persons are no longer entitled to public support should be placed somewhere; and in this case it seems to us to be conferred upon the board of county commissioners. It appears, upon an examination of the provisions of "An act for the relief of the poor," (Comp. Laws 1879, ch. 79,) that the duty of determining in the first instance who are entitled to public support does devolve upon the overseers of the poor; and in counties where a county asylum has not been established, the supervision or control of persons who have been determined to be entitled to relief at the expense of the public remains to a great extent with the overseers of the poor. But where there are regularly established county asylums, different

rules govern, some of which are pointed out in the case of *Smith v. Comm'rs of Shawnee Co.*, 21 Kas. 669. The authority of the township trustee is necessarily limited to the township in which he resides, and § 1 of ch. 79 places a further limitation upon his power by expressly declaring that he shall perform such duties respecting the poor of his township *as may be prescribed by law.* Nowhere is he given any authority or control over the county asylum, its superintendent, or over the persons who have been placed in the asylum. The county commissioners are the chosen agents of the county for the management of its affairs, and by § 25 of ch. 79, they are authorized, whenever it is deemed advisable by them, to purchase land, and build, establish and organize an asylum for the poor, and to employ a superintendent, who shall take charge of and conduct the asylum upon such terms and under such restrictions as the board shall consider most advantageous for the interests of the county. The duties of superintendents and the authority by which they are to be governed are stated in § 26 of the act, wherein they are required —

"To receive into his or their care and custody all persons who may become a county charge, as paupers, and to take such measures for the employment and support of such paupers, and to perform such other duties, as the board of county commissioners shall from time to time establish, order and direct, consistent with the laws of this state."

By § 31, the superintendent is required to give a bond to the county board conditioned for the faithful discharge of his duty; and he is further required to make to the board a detailed written report of the paupers admitted to the asylum, the condition of their health, and their fitness for labor, the result of their industry, and the expense incurred in their maintenance. In the same section it is made the duty of the members of the county board to personally visit and inspect the poor-house once a year. In § 37 the commissioners are authorized to appoint a board of visitors annually, to consist of one person from each township of the county, or a less number as they may think best, to visit the asylum at least

once a year, and to report to the commissioners its condition, and the treatment, management and condition of the inmates thereof. These provisions, when read together, clearly place the establishment and subsequent control of the asylum in the county board. The superintendent is employed by the commissioners, reports only to them, and while the overseers of the poor primarily determine who are paupers, and who shall be placed in charge of the superintendent of the asylum, yet his employment, care and custody of such paupers after they reach the asylum is under the orders and direction of the county commissioners. Under this authority it is the province of the commissioners to prescribe rules and to direct the superintendent respecting the discharge of inmates who are no longer entitled to support at the public expense. That they may do this intelligently, the statute provides that they shall personally visit and inspect the asylum, and that the superintendent shall make a full report of the health and ability to labor of the inmates; and the board of visitors that is annually appointed to visit the asylum, and which may consist of one representative from each township of the county, is to report to the commissioners the management of the institution and the condition of those therein. Upon information thus derived they are to direct the superintendent in the management of the asylum, and in the custody and disposition of the inmates. When rules are prescribed or orders given by the commissioners, it remains only for the superintendent to comply with them.

County asylum; power of county board; duty of superintendent.

Another view of the case is equally fatal to the claim of the superintendent. It appears that in July, 1882, when the commissioners ordered that Kate Patten and her child be discharged from the poor-house, they determined to and did provide for their maintenance outside of the county asylum. This authority is conferred upon the board without regard to the existence of a poor-house in the county, and independent of any action of the overseers of the poor. It is discretionary with the board to provide relief for certain classes of paupers outside the poor-house, and among which are the parents of

helpless children. (Comp. Laws 1879, ch. 79, § 8; *Smith v. Comm'rs Shawnee Co.*, supra.)

It follows that the rulings complained of are erroneous. The judgment of the court below will therefore be reversed, and the cause remanded for further proceedings.

All the Justices concurring.